IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JACKIE LAROQUE,                    )
                                   )
              Plaintiff,           )
                                   )
       v.                          )    Case No.
                                   )    08-0912-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
              Defendant.           )

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jackie Laroque seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title XVI of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred
(1) in finding plaintiff not credible, and (2) in relying on an
answer to a hypothetical which did not encompass all of
plaintiff's impairments. I find that the substantial evidence in
the record as a whole does not support the ALJ's finding that
plaintiff was not disabled. Therefore, plaintiff's motion for
summary judgment will be granted and the decision of the
Commissioner will be reversed.

## I.    BACKGROUND

On September 14, 2004, plaintiff applied for disability
benefits alleging that she had been disabled since January 1,
2001. Plaintiff's disability stems from among other things
diabetes, depression, and anxiety. Plaintiff's application was

denied on January 11, 2005.  On November 14, 2006, a hearing was held before an Administrative Law Judge.  On February 16, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On October 9, 2008, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

On May 8, 2009, plaintiff was found disabled beginning February 20, 2007 (Ex. 1 to plaintiff's brief).

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert George McClellan, in addition to documentary evidence admitted at the hearing.

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1976 through 2001:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $    417.95 | 1989 | $    112.00 |
| 1977 | 2,599.34 | 1990 | 357.18 |
| 1978 | 742.00 | 1991 | 1,211.34 |
| 1979 | 0.00 | 1992 | 0.00 |
| 1980 | 547.32 | 1993 | 3,918.58 |
| 1981 | 2,000.00 | 1994 | 3,096.05 |
| 1982 | 326.50 | 1995 | 1,152.48 |
| 1983 | 0.00 | 1996 | 1,059.79 |
| 1984 | 0.00 | 1997 | 62.43 |
| 1985 | 0.00 | 1998 | 334.96 |
| 1986 | 0.00 | 1999 | 25,505.55 |
| 1987 | 309.22 | 2000 | 28,600.00 |

| 1988 | 0.00 | 2001 | 8,800.00 |

(Tr. at 89, 96).  Plaintiff had no earned income from 2002
through 2006 (Tr. at 94).

**Function Report - Adult**

In a Function Report completed on October 4, 2004, plaintiff
reported that she gets up and eats, tries to clean, goes to sleep
for a while at noon, gets up and takes a bath (every other day),
eats a sandwich, tries to vacuum, has dinner, then goes to bed
(Tr. at 102).  She does not take care of any other person (Tr. at
103).  She gives her dog fresh water every day and food every
evening (Tr. at 103).  Her son walks the dog as she is no longer
able (Tr. at 103).  She wakes up twice per night due to hip pain
(Tr. at 103).  Plaintiff needs help lifting and has a hard time
getting out of the bath tub, but she can dress herself, care for
her hair, shave, feed herself and use the toilet without
assistance (Tr. at 103).  Plaintiff cooks spaghetti, pancakes,
sandwiches, meat, potatoes, apples, macaroni and cheese, and
toast, but she has help with her meal preparation (Tr. at 104).
Plaintiff does laundry and waters her trees and shrubs (Tr. at
104).  She does some cleaning, but she has to work very slowly
for about 30 minutes before resting (Tr. at 104).  Her children
finish her housework for her (Tr. at 104).  Plaintiff is able to
drive, but she does not go out alone because she has panic

attacks (Tr. at 105). Plaintiff shops about once a month with assistance, but sometimes her children do the shopping for her (Tr. at 105). Plaintiff is able to pay her bills and count change, but she has never written a check (Tr. at 105). Plaintiff used to make porcelain dolls, but she no longer goes to her doll making class because she is afraid she will have a panic attack which would be embarrassing (Tr. at 106). Plaintiff goes to the park sometimes and talks with her aunt or her kids (Tr. at 106). Plaintiff does not have a social life because people talk about her and do not like her (Tr. at 107). She has not spoken to her mother in a year (Tr. at 107). Plaintiff's dog is her "best friend in the world." (Tr. at 107). Plaintiff was asked to circle the abilities with which she has trouble; she circled lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, seeing, memory, concentration, understanding, following instructions, and using her hands (Tr. at 107).

**Statement dated October 5, 2004**

Plaintiff reported that she does about ten minutes of a low-impact exercise tape with her son's fiancée, she can walk for five to ten minutes, she can reach in front of her but not overhead, and her hands are stiff and it is difficult for her to make a fist (Tr. at 127).

**B.    *SUMMARY OF MEDICAL RECORDS***

On July 20, 2004, plaintiff presented to Truman Medical
Center for follow up of diabetic neuropathy,[1] diabetes mellitus,[2]
anxiety, depression, and hyperlipidemia[3] (Tr. at 309-312). She
reported burning back and hip pain. It was noted that plaintiff
had been suicidal the last time she was at the clinic but was
determined not to be a danger to herself. Frederick DeFeo, M.D.,
noted plaintiff had diabetes mellitus with neuropathy and very
poor pain control along with depression and anxiety. He
instructed plaintiff to talk to her psychiatrist about her

---

[1]Diabetic neuropathy is a common complication of diabetes in
which nerves are damaged as a result of high blood sugar levels
(hyperglycemia).  Symptoms in the digestive tract include
constipation, diarrhea, nausea and vomiting, and difficulty
swallowing.   Symptoms in legs and arms include deep pain, most
commonly in the feet and legs; loss of the sense of warm or cold;
muscle cramps; numbness; tingling or burning sensation in the
extremities, particularly the feet; and weakness.  Other symptoms
include dizziness, drooping eyelid, drooping face, drooping
mouth, light-headedness when standing up, loss of bladder
control, rapid heart rate, speech impairment, and vision changes.

[2]Diabetes mellitus is a group of metabolic diseases
characterized by high blood sugar (glucose) levels that result
from defects in insulin secretion, or action, or both. Normally,
blood glucose levels are tightly controlled by insulin, a hormone
produced by the pancreas.  Insulin lowers the blood glucose
level.  When the blood glucose elevates (for example, after
eating food), insulin is released from the pancreas to normalize
the glucose level.  In patients with diabetes, the absence or
insufficient production of insulin causes hyperglycemia.
Diabetes is a chronic medical condition, meaning that although it
can be controlled, it lasts a lifetime.

[3]Hyperlipidemia is an elevation of lipids (fats) in the
bloodstream.

prescription for Remeron (antidepressant) because it caused her
to eat late at night, affecting her blood sugar levels. He also
noted that plaintiff's severe pain was partially controlled by
Ultram (narcotic-like pain reliever) and Tylenol 3 (narcotic). He
ordered a neurology consult because plaintiff had failed to find
relief with Elavil (tricyclic antidepressant) and Gabapentin.[4]

On August 4, 2004, plaintiff presented to the emergency room
at Medical Center of Independence ("MCI") with reports of trouble
breathing, chest wall tenderness, and coughing (Tr. at 170-178).
She was diagnosed with acute bronchitis and chest wall pain. She
received prescriptions for Vicodin (narcotic) and Keflex
(antibiotic).

She returned on August 7, 2004, without improvement in her
symptoms (Tr. at 158-165). Plaintiff's chest x-ray was normal.

On August 20, 2004, Dr. DeFeo noted in a letter that
plaintiff suffered from poorly controlled diabetes with chronic
pain which he believed was due mostly to diabetic neuropathy (Tr.
at 142). He reported he had tried her on a number of medications
for her pain but they helped only a little. He noted diabetic
neuropathy was often very hard to treat, and he was finding this
so in plaintiff's case. Dr. DeFeo did not believe plaintiff

---

[4]Gabapentin is an anti-epileptic medication, also called an
anticonvulsant. It affects chemicals and nerves in the body that
are involved in the cause of seizures and some types of pain.

could presently hold a job because of her pain and depression.

On August 23, 2004, plaintiff presented to Samuel Rodgers Community Health Center (Tr. at 145). Her doctor completed a psychiatric progress report. Plaintiff reported experiencing back pain, anxiety, and depression. The doctor diagnosed bipolar disorder, post traumatic stress disorder, dependent personality disorder, and prior substance abuse. He prescribed Remeron (antidepressant) and Xanax (treats anxiety) and increased her dose of Zoloft (antidepressant).

On August 30, 2004, plaintiff returned to Truman Medical Center for a neurological consult (Tr. at 308). The neurologist concluded that plaintiff's onset of symptoms and description were atypical for a neuropathy. In addition, electromyogram ("EMG") and nerve conduction velocity ("NCV") tests performed in May 2004 were not consistent with diabetic neuropathy, but showed a mild superficial peroneal neuropathy.[5] Plaintiff was advised to get an orthopedic or rheumatology evaluation.

_____

[5]Impairment of the paroneal nerve. The nerve-fibers constituting the peroneal nerve travel with the huge sciatic nerve that runs behind the femur from the buttock to the lower thigh where the "common peroneal nerve" splits out from the pack and runs along the outside of the knee, tucking behind the head of the fibular bone (a knobby protrusion just beyond the knee) and then snaking around the neck of the fibula just below its head. The neck of the fibula forms the floor of the fibular tunnel through which the common peroneal nerve must pass.

On September 20, 2004, plaintiff returned to the clinic at Truman Medical Center (Tr. at 300-302). Ryan Huyser, M.D., noted plaintiff had chronic pain in her lower back and bilateral hips. Dr. Huyser indicated plaintiff had gotten extensive workups including previous orthopedic and rheumatology evaluations. Plaintiff had some relief of her pain with Ultram (narcotic-like pain reliever) and Tylenol 3 (narcotic). Dr. Huyser concluded that plaintiff's diabetes mellitus was uncontrolled and her last HgbA1c[6] was 12[7] in April 2004. He noted she was on Lantus insulin 12 units qhs (at bedtime) and six units of Humalog before meals, and her blood sugars ran 82 to 361. He increased her dose of Lantus to 15 units. He also refilled prescriptions for Ultram

_____

[6]Home blood sugar (glucose) testing is an important part of controlling blood sugar for people with diabetes. One important goal of diabetes treatment is to keep the blood glucose levels near the normal range of 70 to 120 mg/dl before meals and under 140 mg/dl at 2 hours after eating. Since blood glucose levels can fluctuate widely, even frequent home glucose testing may not accurately reflect the degree of success in controlling blood sugar. The hemoglobin A1c test is a valuable measure of the overall effectiveness of blood glucose control over a period of time. In the body, glucose sticks to proteins. The red blood cells that circulate in the body live for about three months before they die. When sugar sticks to these cells, it gives an idea of how much sugar has been around for the preceding three months. In most labs, the normal range is 4-5.9%. In poorly controlled diabetes, it is 8.0% or above, and in well controlled patients it is less than 7.0%. The benefits of measuring A1c are that is gives a more reasonable view of what is happening over the course of time (3 months), and the value does not bounce as much as finger stick blood sugar measurements.

[7]An A1c of 12 typically means an average blood sugar of 345 for the past three months.

and Tylenol 3.

Plaintiff returned on November 22, 2004 (Tr. at 294-296). She reported having four hypoglycemic (low blood sugar) attacks since her last visit. Laboratory results revealed HgbA1c drawn on October 14, 2004, was 13.1, higher than it had been previously, despite Lantus 15 units and Humalog 6 units before meals. Plaintiff's main concern at this visit was her depression. She reported suicidal ideation but denied having any plans for execution. Dr. DeFeo noted that plaintiff needed much better control of her diabetes mellitus and discussed methods of slowly increasing both her Lantus and Humalog; he increased her dosage of Zocor for hyperlipidemia; and he indicated he would try to get her an orthopedic consult for her hip pain once staffing issues had resolved. He continued prescriptions for Ultram and Tylenol 3.

On December 1, 2004, plaintiff presented to Joyce Majure-Lees, M.D., for a disability evaluation at the request of Disability Determinations (Tr. at 198-201). Plaintiff reported she suffered from depression, anxiety, diabetes mellitus, and hypoglycemia. She said she had three hypoglycemic episodes the previous month. She also reported lower back pain into her hips, balance problems, and memory loss. Plaintiff stated her son helped her with house work. She said she could lift a gallon of

milk using both hands and could walk her dog one block. On physical examination, plaintiff had full range of motion of her shoulders, elbows, and wrists. Deep tendon reflexes were absent at the ankle. She had decreased flexion of her cervical spine, and straight leg raising caused pain in the supine position. Her medications included Alprazolam (also known as Xanax, treats anxiety), Zoloft (antidepressant), Tramadol (also known as Ultram, a narcotic-like pain reliever), Zocor (treats high cholesterol), Albuterol inhaler,[8] Remeron (antidepressant), Lantus insulin (for diabetes), and Humalog (insulin, treats diabetes). Dr. Majure-Lees diagnosed anxiety and depression; insulin-dependent diabetes mellitus; low back pain without radiculopathy and with good strength in her lower extremities; and asthma with no evidence of dyspnea, wheezing, or rhonchi noted. She concluded that plaintiff could lift 10 pounds frequently and 20 pounds occasionally; walk/stand for three to four hours out of eight hours; and sit six out of eight hours with the usual breaks.

On December 27, 2004, plaintiff returned to Truman Medical Center for follow up of diabetes mellitus and pain (Tr. at 288-291). Her blood sugars ranged from 100 to 350 over the past month, and she had three episodes of hypoglycemia. She thought

---

[8]A bronchodilator that relaxes muscles in the airways and increases air flow to the lungs.

13

the Remeron she took for depression increased her appetite at night and may be the cause of increased blood sugars in the morning. She was taking Zoloft for depression but did not think it was working. She reported chronic back and hip pain that had extended to include her hands and elbows. Dr. DeFeo noted that plaintiff's diabetes mellitus was under very poor control and prescribed Metformin in hopes of regulating her blood sugar. He continued Ultram and Tylenol 3 for chronic pain.

Plaintiff returned to Truman Medical Center on February 3, 2005, for follow up (Tr. at 284-287). She had elevated glucose levels with darkened urine. She also complained of an earache. Dr. DeFeo noted that plaintiff's diabetes mellitus was out of control and instructed her to increase her dose of Lantus to 20, 25, or 30 depending on a week's worth of morning sugar levels. He continued Ultram and Tylenol 3 for pain.

On March 17, 2005, plaintiff returned to Truman Medical Center (Tr. at 281-283). Her glucose levels were not under control, ranging from 114 to 341. She complained of painful spots on the bottom of her feet. She was keeping regular appointments at Samuel Rodgers for anxiety and depression. Plaintiff was instructed to increase Lantus (insulin) and take it in the morning instead of at night. In addition, she was advised to go to Rheumatology.

On April 20, 2005, plaintiff presented to Swope Health Services for an initial intake assessment (Tr. at 222-228). She reported that she had been receiving mental health treatment at Samuel Rodgers but they no longer accepted her insurance. She stated her anxiety had been very bad the past six months. She described a history of depression and anxiety for which she had been receiving treatment for 15 years. She had a history of suicide attempts ten years earlier. Plaintiff stated her anxiety had affected her daily activities. She said she used to go to classes to make porcelain dolls but stopped because of anxiety attacks. She described trouble with concentration, hearing music and voices, and panic attacks. Plaintiff stated she was physically and emotionally abused as a child and spent time in a group home. Her current medications included Zoloft, Xanax, and Remeron. John Troutman, MSW, LCSW, reported plaintiff had severe anxiety, depression, and somatic concerns; and moderate suicidality, guilt feelings, hostility, hallucinations, and distractibility. He diagnosed major depressive disorder with psychotic features, panic disorder not otherwise specified, and rule out post traumatic stress disorder. Plaintiff's global assessment of functioning ("GAF") score was 44.[9]

---

[9]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends,

On May 9, 2005, plaintiff presented to Dr. DeFeo at Truman
Medical Center (Tr. at 275-280). Laboratory results from May 2,
2005, revealed glucose of 339, and HgbA1c of 12.1. She reported
suffering from diabetes mellitus, arthritis, hyperlipidemia,
anxiety/depression, restless leg syndrome, earache, and diffuse
pain in her upper arms. On examination, her right ear had a
bulging ear drum and her left ear had otitis externa;[10] she had
widespread tenderness to touch, superficial palpation, and deep
palpation; and her mood and affect were anxious. Dr. DeFeo noted
plaintiff's muscle pain was not controlled with Ultram. He
suspected fibromyalgia. He prescribed Percocet (narcotic). In
addition, plaintiff received refills for Remeron and Xanax for
anxiety and depression. Although plaintiff had been told to take
her Lantus insulin in the morning instead of at night, she had
continued to take it at night. She was told to take 15 units of
the Lantus in the morning (as opposed to the 20 units she had
been told to take before) for two weeks and, if her morning blood
sugar was still "high" she was to increase it to 20 units.
Plaintiff was not told what blood sugar reading constituted
"high" for purposes of increasing her own medication.

_____

unable to keep a job).

[10]An infection of the external auditory canal; also known as
swimmer's ear.

16

On July 21, 2005, plaintiff was seen at Truman Medical
Center (Tr. at 267-271). She showed the doctor her home record
of blood sugars which ran from 300 to 600 in the morning and from
120 to 200 at night. She was taking Lantus in the morning and
Humalog before each meal. She reported her muscles were painful
when touched. She said she was being treated by Dr. True for
anxiety and depression. Physical examination revealed widespread
tenderness to superficial and deep palpation, and to touch. Her
mood and affect were anxious. Molly Lewandowski, M.D., noted
plaintiff's diabetes was not controlled and increased her dose of
Lantus. Regarding chronic whole body muscle pain, Dr. Lewandowski
noted that plaintiff's primary care provider felt it could
possibly be fibromyalgia. Dr. Lewandowski prescribed Vicodin
(narcotic) and scheduled a rheumatology appointment.

On August 5, 2005, plaintiff saw James True, M.D., a
psychiatrist at Swope Parkway Health Center Mental Health (Tr. at
220-221). She said she needed a new psychiatrist due to changes
in her insurance. At the time plaintiff was taking Zoloft,
Xanax, and Remeron. On mental status exam, Dr. True noted that
plaintiff was anxious, had a depressed mood and a tired affect.
Her content of speech had multiple somatic concerns and
organizational issues. He diagnosed major depressive disorder
and panic disorder. He noted her global assessment of functioning

17

score was 45.[11]   Dr. True recommended a low level antipsychotic.

On August 17, 2005, plaintiff presented to Truman Medical Center for a rheumatology consult for evaluation of severe joint pain, particularly in the lower back, but to her entire body (Tr. at 265-266).  Lynn DeMarco, M.D., assessed arthralgia (pain in the joints) and myalgia (muscle pain) without evidence of inflammatory arthropathy.[12]  Dr. DeMarco noted that plaintiff did not meet the criteria for any connective tissue disease at that time.  Dr. DeMarco planned to obtain previous x-ray records and see plaintiff in follow up.

On August 18, 2005, plaintiff presented to Dr. DeFeo at Truman Medical Center with reports of dizzy spells (Tr. at 257-262).  She said she was seeing Dr. True for anxiety and depression and he changed her prescription from Remeron to Amitriptyline and Benadryl, in addition to Zoloft and Xanax. She was unhappy with this change because she was not sleeping. Plaintiff's mood and affect were agitated on exam. She was given

---

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[12]Inflammatory arthropathy is a generic name to cover a few different types of arthritis, e.g., rheumatoid arthritis and gout.  With an inflammatory arthritis the synovium or joint lining becomes inflamed and this can ultimately damage the joint. It is common to have several joints that are affected with an inflammatory arthropathy.

Meclazine for dizziness and Dr. DeFeo ordered a neurology consult.

On August 30, 2005, plaintiff returned to Swope Parkway Health Center for follow up of diabetes and back pain (Tr. at 217-219). She reported having had spine x-rays at Truman Medical Center. Laboratory results revealed her blood glucose was 539.

On September 15, 2005, plaintiff presented to Truman Medical Center for follow up with Dr. DeFeo (Tr. at 247-250). Lumbar spine x-rays were normal. Plaintiff stated the Meclazine did not help her dizzy spells. Her diabetes mellitus was under very poor control with blood sugar of 458 that morning. She was scheduled to visit the endocrine clinic. Dr. DeFeo instructed her to continue Lantus and Humalog and restart Metformin, gradually increasing her dose. She was to continue Ultram and Vicodin for back pain.

On September 28, 2005, plaintiff had a magnetic resonance imaging ("MRI") scan of her head to evaluate dizziness (Tr. at 247-250). The MRI was essentially negative.

On November 17, 2005, plaintiff went to urgent care at Truman Medical Center for follow up of cellulitis, a bacterial skin infection (Tr. at 245-246). She was at the emergency room two weeks earlier for this condition and was given doxycycline. Her doctor noted the cellulitis was very well healed with no

drainage.

On January 9, 2006, plaintiff saw Dr. DeFeo at Truman
Medical Center for follow up (Tr. at 239-244).  Her main concern
that visit was right lateral pain in her right arm in the deltoid
area. Other problems included uncontrolled diabetes mellitus,
severe back pain, anxiety and depression, and sinus pressure. On
physical examination, range of motion was limited in the right
arm, with pain upon movement in the right lateral portion in the
deltoid area. She had retinal bleeding. Her glucose level was
uncontrolled at 331.  Plaintiff was referred for endocrine
consult and for x-rays of her right arm.  Her prescription for
Tramadol (narcotic-like pain reliever) was refilled.

Plaintiff returned to Truman Medical Center on February 20,
2006, with continued reports of severe pain in her right arm (Tr.
at 230-238).  Dr. DeFeo noted that an x-ray from February 2,
2006, was negative for any bony abnormality.  Plaintiff's
diabetes mellitus remained uncontrolled with an HgbAc1 of 11.0
(indicating an average glucose of 310 for the past three months)
on February 2, 2006. She requested to be on less Humalog because
she said her blood sugars drop to around 20.  She also requested
a prescription for Remeron to help her sleep and regain some
weight. She needed refills for Xanax, Zoloft, and Vicodin.  On
physical exam, her doctor noted she had lost seven pounds in one

month.  Exam of her lungs revealed wheezes.  Dr. DeFeo noted that plaintiff's diabetes was under poor control and she seemed to have low post-prandial (after eating) sugars.  He instructed her to stop Humalog and said she might need to increase Lantus.  He thought her muscle pain could be neuropathy (nerve damage) and he prescribed Gabapentin[13] and ordered a diabetes consult.  He continued her prescriptions for Ultram and Vicodin and prescribed doxycycline for acute bronchitis.

On February 20, 2006, Dr. DeFeo completed a Medical Source Statement of Physical Work-Related Impairments for plaintiff (Tr. at 314-323). He indicated he had treated plaintiff since April 2002.  He noted she had poor response to treatment and her prognosis was guarded. He attached a copy of plaintiff's most recent treatment note.  Dr. DeFeo did not complete any of the form asking for plaintiff's ability to lift, carry, sit, stand, walk, etc.  He wrote, "Would not have the facilities to do this testing at TMC [Truman Medical Center]."

On April 24, 2006, plaintiff's therapist, John Troutman, completed a Medical Source Statement of Physical and/or Mental Work-Related Impairments (Tr. at 324-328).  He indicated he started treating plaintiff on April 25, 2005, and last saw her on

---

[13]An anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.

January 12, 2006. His treatment included psychotherapy, supportive therapy, and cognitive therapy. He found that plaintiff was "seriously limited; less than satisfactory but not precluded," in her ability to:

- relate to co-workers
- deal with the public
- deal with work stress
- maintain attention and concentration
- behave in an emotionally stable manner
- relate predictably in social situations
- demonstrate reliability.

He found that plaintiff had a fair ability to:

- follow work rules
- use judgment
- interact with supervisors
- function independently
- understand, remember, and carry out simple job instructions
- maintain personal appearance

On April 27, 2006, Dr. True, plaintiff's psychiatrist, completed a Medical Source Statement of Physical and/or Mental Work-Related Impairments (Tr. at 329-331). He noted that he began treating plaintiff in August 2005. Her diagnoses were major depressive disorder and panic disorder. He treated her

with Xanax and Zoloft. Dr. True indicated that plaintiff's response to treatment was minimal and she continued to be anxious. Her prognosis was guarded. He reported that plaintiff had poor ability to interact with supervisors; deal with work stress; understand, remember, and carry out detailed or complex job instructions; and demonstrate reliability.

On October 3, 2006, plaintiff saw Dr. True at Swope Behavioral Health (Tr. at 351). On mental status examination, Dr. True noted plaintiff was shaky and her mood was depressed. He diagnosed major depressive disorder and panic disorder with somatic overlay. Her GAF was 50.[14] He increased her dose of Xanax and continued Zoloft.

On October 17, 2006, plaintiff was seen at Swope Health Center with reports of pain in her ribs and shoulder (Tr. at 357). Most of this record is illegible.

On December 7, 2006, plaintiff saw Dr. DeFeo at Truman Medical Center and said she was not feeling well (Tr. at 344-348). She had not had an orthopedic consultation for her right shoulder pain which was sharp and localized to her right shoulder and limiting to her range of motion. A recent MRI demonstrated a

---

[14]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

tear in the supraspinatous tendon and infraspinatous tendonopathy without tear.  It also demonstrated lateral outlet stenosis with moderate acromioclavicular joint degenerative changes. Orthopedics had been consulted but Dr. DeFeo planned to continue pain control until she could be seen.  Plaintiff had a history of asthma and was using her Albuterol twice a day.  Plaintiff's diabetes mellitus was poorly controlled with sugar levels ranging from 42 to 320.  It was recently determined that she had a cataract. She suffered from chronic obstructive pulmonary disease.  She was diagnosed with thrush in her mouth, cough, shoulder pain, diabetes, cataract, severe anxiety and depression, asthma, and chronic obstructive pulmonary disease.  Dr. DeFeo ordered blood work, including a liver profile due to thrush and fatigue and an A1C test, and told plaintiff to stop smoking.

Plaintiff returned to Truman Medical Center on December 21, 2006 (Tr. at 341-343).  Lab results revealed her glucose was high at 404, and HgbA1c was high at 11.6 (an average blood sugar of about 330 over the past three months).  She continued to have thrush.  She had lost 14 pounds in three months, and she said she did not have the energy to cook proper meals.  Her diabetes was poorly controlled.  She reported she was very sensitive to the insulin.  Fifteen units of Lantus would cause her blood sugar to plummet into the 40s; but on 14 units at night, her blood sugar

would run 160 to 200 in the morning, and even at that level she felt sick. Plaintiff was instructed to go to the diabetes clinic for management and to podiatry for management of calluses. She was encouraged to stop smoking. Her weight loss was thought mostly likely secondary to malnutrition. Dr. DeFeo refilled her prescription for Vicodin.

On February 9, 2007, plaintiff underwent pulmonary function tests at Truman Medical Center (Tr. at 359-360). The results revealed moderate obstructive airways disease, emphysematous type.

### C. *SUMMARY OF TESTIMONY*

During the November 14, 2006, hearing, plaintiff testified; and George McClellan, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 45 years of age (Tr. at 365). She was living in a mobile home with her 22-year-old son (Tr. at 365). Plaintiff was divorced and had one other son (Tr. at 365). Plaintiff has had a Medicaid card for about six years, she gets food stamps, and she receives assistance with her gas bill (Tr. at 367).

Plaintiff has difficulty writing because she cannot spell very well (Tr. at 366). She does not understand when she tries

to read a newspaper (Tr. at 366).  She can do simple addition and subtraction and can make change (Tr. at 366).  Plaintiff has a driver's license and drove to the administrative hearing (Tr. at 366).  She is able to drive to the doctor or to her lawyer's office (Tr. at 389).

Plaintiff is 5 feet 3 inches tall and weighs about one hundred pounds (Tr. at 368).  Plaintiff stopped smoking about a month before the hearing (Tr. at 368).  She was diagnosed with diabetes about seven years earlier (Tr. at 371).  She lost her job as a bus driver because they told her she could not drive a bus if she is insulin-dependant (Tr. at 394).  She uses insulin and checks her blood sugar four times a day (Tr. at 371-372).  Although she tries to eat properly, her blood sugar typically runs high (Tr. at 372).  Plaintiff makes very poor decisions when her blood sugar is high (Tr. at 372).  She gets sick to her stomach and feels very hungry (Tr. at 372).  When her sugar is high, she takes insulin; then she "bottoms" and cannot comprehend when people talk to her (Tr. at 373).  When her blood sugar drops, she has trouble seeing out of one eye (Tr. at 373).  Plaintiff has diabetic peripheral neuropathy which causes pain in her right leg and right arm (Tr. at 374).  She cannot use her right arm for much of anything (Tr. at 374, 375).

Plaintiff has had two surgeries on her feet due to bunions and calluses (Tr. at 376). In one surgery, the doctor broke plaintiff's foot and had to totally reconstruct all the bones in her foot (Tr. at 376). Although the surgeries helped, plaintiff's toes have become "hammered" again and she has no circulation in her feet (Tr. at 378).

Plaintiff has asthma and allergies (Tr. at 378). She has to use Advair twice a day because her asthma is "not real great" (Tr. at 378). About a year before, plaintiff had to go to the hospital in an ambulance because she was having trouble breathing (Tr. at 379). Plaintiff has allergies all year long (Tr. at 379). Plaintiff's dog sleeps with her, and she is allergic to the dog (Tr. at 379-380). Her doctor suggested having the dog sleep outside the bedroom, but the dog did not like that and it did not seem to help plaintiff (Tr. at 38).

Plaintiff is on Zoloft and she sees a therapist and a psychiatrist for depression (Tr. at 380). She sees John, her therapist, once a week; and she sees Dr. True, her psychiatrist, once a month (Tr. at 380). Plaintiff has been seeing John for a couple years (Tr. at 381). About two or three days per week, plaintiff's depression gets really bad and she cannot work her way out of it (Tr. at 381). Plaintiff used to think she was depressed because she had no money, but when she worked caring

for her grandmother she had money and was still depressed (Tr. at 382). When her anxiety gets bad, plaintiff will sometimes be awakened by voices, knocks at the door, or music that is not really there (Tr. at 390).

Plaintiff earned approximately $25,000 a year from 1999 to 2001 as an in-home caregiver for her grandmother (Tr. at 369). When her grandmother started deteriorating, plaintiff had to help her use the toilet and had to bathe her (Tr. at 383). There came a time when plaintiff could no longer physically do those things (Tr. at 383). Her grandmother fell a couple times and plaintiff could not get her off the floor (Tr. at 383). Her grandmother was then moved to a nursing home (Tr. at 370, 371). Plaintiff's back continues to hurt, and she takes Tramadol for that which helps enough to allow her to get some things done (Tr. at 383).

Plaintiff's son goes to the store with her, does the lifting, brings the groceries in the house, and puts the heavy items away for her (Tr. at 384). Plaintiff rarely walks around the store; her son does it for her (Tr. at 384). He drives for her when she feels dizzy (Tr. at 387). Plaintiff does laundry but she does not have a dryer so she hangs her wet clothes on hangers and puts them in her closet (Tr. at 384). She does not carry a basket of wet clothes, she just carries a few items (Tr. at 384). Plaintiff has another son, age 22, who lives with her,

but he is disabled (Tr. at 385, 386).  Plaintiff does her son's
laundry, and she cooks for them both (Tr. at 384).  Her son is
moderately mentally retarded and he has severe learning
disabilities (Tr. at 385).  He can dress himself and feed himself
but it is hard to get him to do things like taking out the trash
because he cannot focus (Tr. at 385-386).  Plaintiff has to take
care of her son's disability money for him because he cannot
handle it (Tr. at 386).

Plaintiff does the vacuuming, mopping, and other household
chores (Tr. at 386).  It takes her about three hours to vacuum
her entire mobile home (Tr. at 387).  She can stand for about 20
minutes but she cannot walk for very long due to arthritis in her
hips (Tr. at 387).  She can sit in her recliner for about 20
minutes before her back starts hurting (Tr. at 391).  When the
ALJ commented that plaintiff had been sitting at the hearing for
40 minutes at that point, she said that her back was killing her
(Tr. at 391).

**2.  Vocational expert testimony.**

Vocational expert George McClellan testified at the request
of the Administrative Law Judge.

The first hypothetical involved a person who could perform
light and sedentary work; unskilled; with limited public and co-
worker contact; no climbing or balancing; occasional stooping,

crouching, crawling, and kneeling; standing or walking for a total of three to four hours per day; should avoid concentrated exposure to extremes in temperature, vibrating tools, fumes, odor, dust, gases, poor ventilation, and hazardous machinery (Tr. at 395, 396). This hypothetical was derived from the findings of a DDS doctor on January 8, 2005 (Tr. at 395).

The vocational expert testified that the standing and walking limitation would eliminate about 99 percent of the light jobs (Tr. at 395). With respect to sedentary jobs, the person could be a telephone solicitor or clerk if limited public contact only applies to face-to-face contact (Tr. at 396). The person could be an optical goods processor, polisher, packager, and lens inserter with about 1,100 such jobs in Missouri and 68,000 in the country (Tr. at 397). Finally the person could be a pharmaceutical packager, with 1,000 in Missouri and about 50,000 in the country (Tr. at 397). The optical goods worker requires constant hand work, the packager would require frequent hand work, and the telephone clerk would require frequent hand work (Tr. at 397). If the person were restricted to occasional hand work, she could not really perform 90 percent of the sedentary jobs (Tr. at 397-398).

Finally, considering a person who would have a poor ability to interact with supervisors, poor ability to deal with stress,

and poor ability to demonstrate reliability would not be able to work (Tr. at 399).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Marsha Stroup entered her opinion on February 16, 2007 (Tr. at 15-21).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 17).

Step two.  Plaintiff suffers from asthma, diabetes, depression, and surgeries on her feet, all severe impairments (Tr. at 17).  Plaintiff's back pain is not a severe impairment (Tr. at 17).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

Step four.  The ALJ found that plaintiff's testimony as to the intensity, persistence and limiting effects of her symptoms was not credible (Tr. at 19).  She relied heavily on the opinions of non-examining psychologist Keith Allen, Ph.D., and an unnamed DDS physician, and discredited the opinion of plaintiff's treating therapist (Tr. at 19).  She did not consider the opinion of plaintiff's treating psychiatrist.  The ALJ found that plaintiff has the residual functional capacity to perform sedentary, unskilled, low stress work with limited public contact; no climbing or balancing; occasional stooping,

crouching, crawling, and keeling; and no exposure to extreme temperatures, vibrating tools, fumes, dusts, odors, gases, poor ventilation, or hazardous working conditions (Tr. at 18). With this residual functional capacity, plaintiff cannot return to any of her past relevant work (Tr. at 19).

Step five. The ALJ found that plaintiff could perform the jobs of telephone solicitor or clerk, optical goods processor, or packager (Tr. at 20). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ

explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [T]he claimant was non-compliant with her diabetes medication. She was also advised to seek an orthopedic opinion on the source of her back pain; there are no notes in her file that demonstrate that she was compliant. In addition, she stated, in a questionnaire that she did her own chores including cooking and grocery shopping. Her disability report revealed that she cared of [sic] her two, low functioning sons; she acted as the representative payee for one of her sons whom [sic] is on disability for moderate retardation. She also did laundry, watered her trees, and attended a class where she made dolls.

(Tr. at 19).

I will address these reasons one by one.

1. *Non-compliant with her diabetes medication*. The ALJ's discussion of plaintiff's diabetes consists of the following:

> Dr. Frederick DeFeo stated that her diabetes was poorly controlled. However, the claimant testified that her diabetic control comes and goes; it was currently under "decent" control. Clinical notes from October 2004 stated that the claimant was educated on checking her blood sugars after meals. Since then, her sugars had improved slightly. . . . Clinical notes from Truman Medical Center West stated that the claimant's diabetes

was under very poor control. She was instructed to
continue taking Metformin and complete a chart to
monitor her blood glucose levels. During a follow up
visit the claimant reportedly stopped taking her
Metformin for no clear reason; she was instructed to
re-start the medication. She reported during an
examination that when her blood sugar was 158 before
bedtime she would not take her night time Lantus; then,
by morning her blood sugar level would be 215.

(Tr. at 18).

Comparing the record cited by the ALJ to her findings
indicates that the findings are not supported by that record.
For example, the ALJ cites the August 20, 2004, letter from Dr.
DeFeo (Tr. at 142) in support of her finding that plaintiff's
diabetes was poorly controlled. That letter states that
plaintiff's diabetes is poorly controlled, but it does not even
hint that the reason her diabetes is poorly controlled is due to
noncompliance.

The ALJ states that plaintiff testified her diabetes was
under "decent" control. However, plaintiff's opinion as to
whether her diabetes is under control is not really relevant
given the fact that her treating physician does not believe her
diabetes is under control. Furthermore, the records of
plaintiff's blood sugar readings and A1c readings clearly
indicate that plaintiff's diabetes is not under decent control.

The ALJ notes that plaintiff's blood sugars improved
slightly after she was educated on checking her blood sugar after

34

meals.  However, slight improvement is a relevant phrase:
plaintiff's blood sugar levels have been so far away from normal
that slight improvement means little.

The ALJ cites the records of Truman Medical Center dated
January 9, 2006 (Tr. at 242) in finding that plaintiff's diabetes
was under very poor control and she was instructed to complete a
chart to monitor her blood sugar levels.  Again, there is nothing
in this record that suggests that plaintiff's abnormal blood
sugar was due to noncompliance.  The record states that due to
financial constraints, plaintiff had been noncompliant with
Zocor,[15] which is a cholesterol lowering drug (Tr. at 240, 242).
Not taking Zocor would have no affect at all on plaintiff's
diabetes.  This record also states that plaintiff's glucose
monitor showed morning readings ranging from 121 to 526 (normal
is 110) despite her taking Lantus in the morning and Humalog
before each meal (Tr. at 240-241).  The doctor changed
plaintiff's diabetes medication (three different prescriptions)
including instructing her to take one dose of one medicine for
one week, and then increase it the next week (Tr. at 242).  If
plaintiff's abnormal blood glucose levels had been due to non-
compliance, the doctor would likely have told her to start taking

---

[15]The medical record lists 20 medications, and Zocor is the
only medication with the notation "not currently taking." (Tr. at
241-242).

her medication rather than changing her prescriptions and dosages.

Finally, the ALJ cites the Truman Medical Center records in finding that plaintiff stopped taking Metformin for no clear reason and she sometimes did not take her Lantus at night time resulting in a blood sugar reading of 215 in the morning. However, the ALJ neglects to consider that (1) plaintiff was given a certain amount of discretion in how much and what medication to take depending on her blood sugar readings; (2) plaintiff's medications and dosages were constantly changed, not only her diabetes medication but her other medications as well; and (3) plaintiff was consistently on approximately 20 different medications while suffering from dizziness, depression, and anxiety, all of which could interfere with her ability to adhere to such a complicated medicine regimen.

Just in the seven months before the appointment cited by the ALJ, the following occurred at only one of plaintiff's treatment providers (Truman Medical Center):

> On February 3, 2005, Dr. DeFeo noted that plaintiff's diabetes was out of control and instructed her to increase her evening dose of Lantus to "20, 25, or 30 depending on a week's worth of AM sugars" (Tr. at 287). He did not specify what would have to happen to plaintiff's morning blood sugar readings before she chose a particular dose of Lantus insulin.

> On March 17, 2005, plaintiff said that sometimes she would not take her Lantus (one form of insulin) at night when her

blood sugar was down to 158, but then it would be 215 in the morning (Tr. at 282). However, plaintiff was repeatedly instructed to adjust the amount of insulin she took based on whether her blood sugar readings were high. To put that into perspective, her last A1c had been 13.1, indicating an average blood sugar level in the upper 300s. Therefore, plaintiff's adjusting her insulin dose to skip the one at night was understandable because 158 is clearly much lower than her normal reading of the upper 300s, and because she sometimes suffered from abnormally low blood sugar after taking her insulin. Hypoglycemia, or low blood sugar, is glucose levels below 70.[16] Symptoms typically appear when blood sugar dips below 60, and levels below 50 affect brain function (see footnote 16).

On May 9, 2005, plaintiff was on 18 different medications (Tr. at 277). Her blood sugar readings had ranged from 43 to 380. She had previously been instructed to take Lantus 20 units in the morning instead of at night, but she continued to take 15 at night. This day she was told to take 15 units of Lantus in the morning for two weeks, then if her morning blood sugar was still "high," she should increase it to 20 units. Plaintiff was out of Tramadol for arthritis, but it could not be refilled until June, 23 days in the future (Tr. at 278). She was given a new prescription, Percocet, for muscle aches; and a new prescription to treat folliculitis (Tr. at 278). Therefore, plaintiff had multiple new medications, she needed to remember to return to the doctor's office in 23 days to get a refill on her Percocet, and she was told to adjust her insulin doses based on whether her blood sugar was still "high" in the morning.

On July 21, 2005, plaintiff's blood sugar records showed morning readings of 300 to 600 and evening readings of 120 to 200 (Tr. at 267-271). Plaintiff was taking Lantus 15 units in the morning and Humalog 6 units three times a day, before each meal (Tr. at 269).

On August 30, 2005, plaintiff was taking 19 different prescriptions (Tr. at 258-259). Plaintiff complained of dizzy spells (Tr. at 260) which the doctor found may be

---

[16]http://www.emedicinehealth.com/low_blood_sugar_hypoglycemia/article_em.htm

related to her diabetes (Tr. at 261).  On her previous visit, plaintiff's Percocet was changed to Vicodin.  In addition, she stated that her psychiatrist had recently changed her Remeron to Amitriptyline and Benadryl which caused severe side effects (Tr. at 259).

On September 16, 2005, the records state that "pt stopped Metformin for no clear reason; re-start Metformin, increasing to 1000 mg bid [twice a day]" (Tr. at 255).  Plaintiff's glucose monitor showed morning readings ranging from 200 to 400.  "Pt is taking Lantus 15 units in the AM and Humalog 6 units TID [three times a day] before each meal. . . .  Continue Lantus and Humalog; start Metformin 500; first 1 tab QD [every day] for one week, then increase to BID [twice a day] for one week; goal is 2 tab BID [twice a day]." (Tr. at 253).  Therefore, plaintiff was told to take 15 units of Lantus in the morning, 6 units of Humalog three times a day, start one pill of Metformin per day for one week, increase her Metformin to two pills a day for an unspecified time, with a goal of increasing her Metformin to two pills twice a day, with no instructions on when she was to increase her dosage to two pills twice a day or under what circumstances.

I find that the substantial evidence in the record does not support the ALJ's credibility finding on this basis.  Normally, failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.  Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997); 20 C.F.R. § 416.930(b).  In this case, I find that there is "good reason" for plaintiff's failure to take her Metformin during the one month that she apparently did not, that reason being that her medication regimen was complicated and required plaintiff to use

discretion in adjusting her own diabetes medication based on her glucose readings.

2. *Advised to seek an orthopedic opinion on the source of her back pain; there are no notes in her file that demonstrate that she was compliant.* The orthopedic opinion was in connection with plaintiff's back and hip pain. The ALJ found plaintiff's back pain not severe and never mentioned plaintiff's hip pain. Therefore, plaintiff's failure to see an orthopedic specialist is irrelevant to the outcome of this case. In any event, the medical records establish that Dr. DeFeo said he would try to get plaintiff an orthopedic consult "for her hip pain once staffing issues had resolved." (Tr. at 294-296).

3. *She stated in a questionnaire that she did her own chores including cooking and grocery shopping.* In the questionnaire, plaintiff stated that she shopped for groceries about once a month with her children's assistance and that sometimes her children did the shopping for her completely (Tr. at 105).

4. *Her disability report revealed that she cared for her two low-functioning sons; she acted as the representative payee for one of her sons who is on disability for moderate retardation.* In her function report, she said she did not care for any other person (Tr. at 103). She does handle her son's

disability payments; however, the ALJ did not indicate how this warred with plaintiff's credibility. Plaintiff's other son was engaged at the time plaintiff completed these documents and did not live with plaintiff.

5. *She also did laundry.* Plaintiff testified that she does not carry a basket of laundry; she carries a few items at a time. She does not have a dryer, so she hangs an item on a hanger and then puts it in her closet.

6. *She watered her trees.* The ALJ did not explain how watering trees made plaintiff capable of engaging in substantial gainful employment, especially considering that her major impairments are mental and related to her diabetes.

7. *She attended a class where she made dolls.* In her function report, plaintiff said she used to make porcelain dolls, but she no longer goes to her doll making class because she is afraid she will have a panic attack which would be embarrassing (Tr. at 106). On April 20, 2005, she told someone at Swope Health Services that she used to attend doll making classes but had to stop going due to anxiety attacks (Tr. at 222-228). There is no evidence that plaintiff attended doll-making classes during the relevant time period.

Based on the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff's subjective complaints are not credible.

## VII. OPINION OF DR. TRUE

The ALJ ignored the opinion of plaintiff's treating psychiatrist, Dr. True, who found that plaintiff had a poor ability to interact with supervisors; deal with work stress; understand, remember, and carry out detailed or complex job instructions; and demonstrate reliability. The vocational expert testified that a person with a poor ability to do these things would not be able to work.

The ALJ gave considerable weight to the opinion of a non-examining state agency psychologist who found that although plaintiff "would likely have difficulty with more demanding activities, she appeared capable of understanding and performing simple, repetitive tasks" (Tr. at 19).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating

physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

The ALJ considered none of these factors before ignoring the opinion of Dr. True.  In fact, the ALJ did not even discredit Dr. True; she simply failed to explain why the opinion of plaintiff's treating psychiatrist was not considered or why she chose to accept the opinion of a non-examining psychologist in place of the opinion of plaintiff's treating psychiatrist.

The ALJ did specifically discredit the opinion of plaintiff's therapist, which essentially mirrored the opinion of Dr. True.  The ALJ had only this to say about the opinion of Mr. Troutman:

> The medical source statement of the claimant's therapist is given little weight.  He stated that the claimant's ability to deal with the public and maintain attention and concentration were poor; however, the claimant stated in her disability report that she attended a doll making class and spent time making dolls and clothing.  The claimant's activities of daily living are not consistent with her therapist.

(Tr. at 19).

As discussed above, plaintiff reported that she had to stop attending doll-making classes due to anxiety attacks. Therefore, the ALJ's reliance on doll making to discredit plaintiff's treating therapist is not supported by the evidence. The ALJ failed to state which daily activities were inconsistent with the therapist's opinion; however, the daily activities relied on by the ALJ to discredit plaintiff were discussed above and found to be inadequate to support her opinion.

Keith Allen, Ph.D., is the state agency psychologist relied on by the ALJ. He supported his opinion based entirely on (1) plaintiff's allegations in her disability paperwork wherein she said she performs routine household chores, drives at times, is able to manage her own funds, can care for herself without reminders, only needs to be accompanied to doctor appointments sometimes, etc., and (2) two medical records wherein she requested a letter from her treating psychiatrist in relation to her application for disability (Tr. at 196).

Plaintiff's daily activities were discussed above. There is nothing in her daily activities which indicates she has a greater mental ability than that found by Dr. True and Mr. Troutman. Finally, plaintiff requested a letter for her disability case when she went to her psychiatrist for treatment. Her request for a letter on that visit does not indicate that her main motivation

for going to the doctor was to get disability benefits.  There are very few (if any) other references in her medical records to her desire to get disability benefits.  Plaintiff went to the doctor often and complained about her physical and mental problems; she was consistently taking approximately 20 different medications for her impairments; and her treating physicians provided opinions which are consistent with plaintiff's allegations; i.e., that she was incapable of working.  Dr. True's opinion is consistent with his treatment records indicating, among other things, that plaintiff's highest GAF was 50 and was usually lower.  A GAF of 50 indicates serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Based on all of the above, I find that the ALJ erred in discrediting the opinion of Dr. True in favor of a non-treating, non-examining psychologist.  I further find that the ALJ erred in failing to find plaintiff disabled based on the testimony of the vocational expert, i.e., that if a hypothetical person had the limitations described by Dr. True that person could not work.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff was not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 26, 2010